**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CHARLES LEWIS**, *et al.*, <br><br> *Plaintiffs,* <br><br><br> **v.** <br><br><br> **UNITED STATES PAROLE COMMISSION**, *et al.*, <br><br> *Defendants*. | **Case No. 1:22-cv-2182-RCL** |

<u>**MEMORANDUM OPINION**</u>

This case involves troubling allegations that the U.S. Parole Commission has been derelict in its statutory obligation to schedule hearings for terminating its supervision over District of Columbia parolees, in violation of D.C. law. Now before the Court is Plaintiffs' motion for class certification and to appoint class counsel. ECF No. 78.

This motion is Plaintiffs' second bite at the Rule 23 apple. In an earlier round of motion practice, the Court concluded that Plaintiffs had satisfied many, but not all, class certification requirements, holding that further discovery would be necessary to determine whether the putative class was sufficiently numerous and that Plaintiffs should refine the class definition in light of that discovery. The Court denied the motion without prejudice and ordered discovery.

As set forth in Plaintiffs' renewed motion, discovery has surfaced disturbing facts concerning the number of parolees who have been denied timely termination hearings in recent years. Acknowledging these failings, the Commission nevertheless moves to dismiss, insisting

1

that the problem is now solved because of a variety of actions the agency has taken to ensure that, going forward, such hearings will occur on time.  ECF No. 88.  But these actions are too little and too late for purposes of overcoming class certification.

Accordingly, the Court will **GRANT** Plaintiffs' motion for class certification and **DENY** the Commission's motion to dismiss.

## I.    BACKGROUND

### A.  The U.S. Parole Commission

The United States Parole Commission (the "Commission") is a federal agency within the Department of Justice that oversees the parole system for people released from incarceration for violations of D.C. law and, in limited cases, federal law.  As relevant to the named plaintiffs' claims, federal and D.C. law tasks the Commission with deciding when a person's term of parole should end.

Under D.C. law, the Commission must terminate parole "[f]ive years after a parolee's release."   D.C. Code § 24-404(a-1)(3).   After that time, parole may continue only if "the Commission determines, *after a hearing*, that legal custody of the parolee should not be terminated because there is a likelihood that the parolee will violate any criminal law." *Id.* (emphasis added).

If the Commission determines that parole should extend beyond five years, the parolee may request a hearing each year thereafter "to determine whether to terminate legal custody," *id.* § 24-404(a-1)(4)(A), and even without a request by the parolee, the Commission must "conduct a hearing every [two] years to determine whether to terminate" its supervision of the parolee, *id.* § 24-404(a-1)(4)(B).   The Commission's regulations incorporate these requirements.   *See* 28

C.F.R. § 2.95(c). The parties refer to these hearings as "early termination hearings" or just "termination hearings," and for purposes of this order, the Court will do the same.[1]

The Commission oversees termination hearings for two categories of D.C. Code parolees. D.C. Code parolees residing within the District of Columbia are supervised by the Court Services Offender Supervision Agency ("CSOSA"), while parolees who live outside of D.C. are supervised by the U.S. Probation Office ("USPO"). The Commission itself schedules early termination hearings for both CSOSA- and USPO-supervised parolees.

### B. Named Plaintiffs

Plaintiffs are D.C. parolees who allege that the Commission failed to hold timely termination hearings to determine whether they should remain on parole. In the original class action complaint filed in July 2022, plaintiff Charles Lewis alleged that he had been on parole for eight years and six months without recieving an early termination hearing. Compl. ¶ 1, ECF No. 1. In the operative amended complaint filed in September 2022, Plaintiff Anthony Mack alleges that at the time of filing, he had not received an early termination hearing since 2012 despite multiple requests. Am. Compl. ¶¶ 12–14, ECF No. 22. In the same 2022 amended pleading,

---

[1] The Commission asserts that "[t]he calculation of when a five-year early termination hearing is due to a parolee is not always as simple as adding five years to the parolee's release date" because there are "many actions a parolee could take that would affect the calculation of the hearing due date by 'stopping the clock' on eligibility." Desrosiers Decl. ¶ 15, ECF No. 88-1. For example, the Commission points out that in calculating the five-year period, regulations prohibit "includ[ing] any period of parole before the most recent release, or any period the parolee served in confinement on any other sentence." Combined Opp'n & Mot. Dismiss ("Defs.' Opp'n") at 5 (quoting 28 C.F.R. § 2.95(d)), ECF No. 88. And "[e]ven when a parolee is due for an early termination hearing, the Commission typically does not provide such hearings to parolees with new pending criminal charges," Desrosiers Decl. ¶ 16, ECF No. 88-1, until they have had a revocation hearing that has resulted in release and reinstatement of parole. *See* 28 C.F.R. § 2.95(e)(2) ("The Commission shall not terminate supervision of a parolee until it determines the disposition of a pending criminal charge."). Plaintiffs argue that § 2.95(e)(2) contravenes the statutory text of D.C. Code § 24-404(a-1) to the extent that it permits the Commission to prolong parole past the five-year or subsequent two-year marks without a termination hearing. Combined Reply & Opp'n to Mot. Dismiss ("Pls.' Reply") at 38, ECF No. 92. As discussed *infra* Part III.B.2, Plaintiffs present the correct view of the relationship between § 2.95(e)(2) of the Commission's regulations and § 24-404(a-1) of the D.C. Code.

Plaintiff Carlton Paige alleges that he had not received an early termination hearing since 2011. *Id.* ¶¶ 16–17, 19.  And plaintiff Darin Hagins alleges that he received no termination hearing after his 2008 release on parole until 2022, when the Commission held a hearing and extended his parole.  *Id.* ¶¶ 20, 24.  Plaintiffs name the Commission and its acting chairman, Patricia K. Cushwa, as defendants (collectively, "the Commission").  Am. Compl. ¶¶ 25–26.

### C.  Previous Class Certification Litigation

In April 2024, plaintiffs moved to certify a class consisting of "[a]ll District of Columbia code parolees who . . . : (1) have not had their parole terminated after being on parole continuously for five years; (2) have not had a termination hearing once they reached five years; and (3) have not had a termination hearing every two years thereafter (where applicable)." *Lewis v. U.S. Parole Commission*, 743 F. Supp. 3d 181, 190 (D.D.C. 2024).  In May 2024, the Commission opposed class certification and sought dismissal on mootness grounds and for failure to state a claim.  *Id.*

In a July 2024 order, the Court denied the Commission's motion to dismiss in all but one respect.  The "inherently transitory" exception to mootness supported subject-matter jurisdiction, and Plaintiffs had stated plausible claims for mandamus relief and under the Administrative Procedure Act.  *Id.* at 194–99.  However, the Court dismissed Plaintiffs' *ultra vires* claim.  *Id.* at 199–201.  As to the motion for class certification, Plaintiffs had met some, but not all, of Rule 23(a)'s requirements.  Plaintiffs satisfied the requirements of typicality and adequacy, and had shown that final injunctive or declaratory relief would be appropriate to the whole class.  *Id.* at 201.  Numerosity and commonality, however, were lacking on the record then before the Court. *Id.*

Regarding numerosity, Plaintiffs had offered only a self-serving declaration from Rashida Edmondson, the chief of the Parole Division at the D.C. Public Defender Service, that failed to

provide "non-conjectural evidence that a significant number of . . . current or future parolees are or will be denied the hearings they are owed," as would be necessary to meet the numerosity requirement. *Id.* at 203. The Court allowed discovery to "ascertain the approximate size of their putative class, or at least to give the Court confidence that it is large enough" to meet numerosity. *Id.*

On commonality, the Court concluded that the question that bound the putative class together—"whether the defendants ha[d] unlawfully withheld their statutorily guaranteed early termination hearings"—was, "in fact, not common to the entire class as currently defined." *Id.* at 203. Recall that, at the time, the putative class was defined as "[a]ll District of Columbia code parolees who . . . : (1) have not had their parole terminated after being on parole continuously for five years; (2) have not had a termination hearing once they reached five years; and (3) have not had a termination hearing every two years thereafter (where applicable)." *Id.* at 190. That class definition would sweep in "parolees who are certainly not entitled to the potential injunctive relief of a court-ordered hearing," for example, "those who were previously overdue for a hearing but have had their parole revoked, or who in the last two years received a late hearing at which their request for early termination was denied." *Id.* at 203. In light of the Court's "lingering uncertainty" about the numerosity and composition of the class, it declined to make the required finding that "uninjured class members" would constitute no more than "a small fraction of the class" on the then-existing record. *Id.* at 204; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 135 (D.D.C. 2017) (explaining that a certifiable class should contain no more than a "de minimis number of uninjured members"). Instead, the Court denied the motion without prejudice "to afford plaintiffs the opportunity to refine their class definition and take discovery as to the size of their putative class." *Lewis*, 743 F. Supp. 3d at 204.

Following three months of discovery between October 2024 and January 2025, Plaintiffs renewed their request for class certification and appointment of class counsel.  Mot. Class Certification ("Mot."), ECF No. 78.[2]  In this motion, Plaintiffs present what discovery revealed about the size of the class and ask the Court to certify a narrower class of "[p]eople on parole for D.C. Code offenses who are overdue and owed, or will be overdue and owed, either termination of parole or a termination hearing as required by law."  Pls.' Mem. Supp. Mot. Class Certification ("Pls.' Mem."), ECF No 78-1.

### D.  Recent Discovery

Discovery was directed toward uncovering the size of the class and shed light on the Commission's system for determining whether and when a parolee will be due for a termination hearing—and when different aspects of those systems were devised.  While it is clear that the Commission had a system, albeit a flawed one, for *scheduling* termination hearings before this litigation began, discovery shows that the Commission's system for *identifying overdue* hearings was devised only in response to this lawsuit.  Helenihi Dep. 134:6–17, ECF No. 78-5 (Ex. D).

### 1.  Pre-Suit System

Before this suit began, the Commission had been heavily reliant on the supervising agencies, CSOSA and USPO, to provide necessary information about parolees to determine when to schedule hearings.  *See* McDaniel Dep. 20:1–6, ECF No. 78-6 (Ex. E) (confirming that in order for the Commission to identify who is owed an early termination hearing, people who work for CSOSA have to take certain steps); *see also* Helenihi Dep. 45:18–22, ECF No. 78-5 (Ex. D).

---

[2]At the same time, Plaintiffs moved for summary judgment.  Mot. Summ. J., ECF No. 79.  However, the Court stayed the summary judgment briefing pending the resolution of the motion to certify a class.  March 10, 2025 Order, ECF No. 85.

Under the old regime, "the Commission [was] often not notified of the release and [did] not learn of the offender's parole status" for "two years." Desrosiers Decl. ¶ 13, ECF No. 88-1. That is because under that system, the Commission only would learn that a parolee has been released when the supervising agency (CSOSA or USPO) submits an "F-3" report, which contains information about the parolee's conduct during supervision. *Id.* ¶¶ 14, 42.

F-3 reports are due to the Commission after two years of supervision and every year thereafter. *See* 28 C.F.R. § 2.94. But the Commission has historically failed to maintain a comprehensive list of everyone on parole, and as a result, it had lacked key facts for tracking when CSOSA needed to—or failed to—submit the report. McDaniel Dep. 46:6–9, ECF No. 78-6 (Ex. E); *see also* Helenihi Dep. 138:1–2, ECF No. 78-5 (Ex. D) (describing "not getting the annual report" as the "most common" cause of overdue hearings). What's more, even when a timely submitted report arrived on the anniversary of someone's parole date, the lengthy bureaucratic process for scheduling a hearing would begin *at* the five-year or subsequent two-year mark—all but guaranteeing a late hearing date. Helenihi Dep. 96:8–22; 113:13–15, ECF No. 78-5 (Ex. D); McDaniel Dep. 12:9–13, ECF No. 78-6 (Ex. E).

Once the Commission received the annual report, the Commission's staff would fill out an "early termination worksheet." Helenihi Dep. 67:4–6, ECF No. 78-5 (Ex. D). But the Commission admits that "at least on one occasion, the Commission has inadvertently failed to schedule an overdue termination hearing following an internal recommendation that parole be continued." Defs.' Objs. & Resps. to Pls.' First Set of Reqs. for Admis., ¶ 9, ECF No. 78-4 (Ex. C). Other times, when Commission staff had recommended that parole be terminated but a Parole Commissioner disagreed, the Parole Commissioner would sometimes "not think to . . . schedule a

termination hearing" under these circumstances.  Helenihi Dep. 102:17–22; 103:1–16, ECF No. 78-5 (Ex. D).

And, historically, even when the Commission has decided to hold a termination hearing, internal failures have not been uncommon.  Upon determining that a parolee is owed a hearing, the Commission generates an "H-36" waiver form, which among other things allows an individual to "waive" their hearing.  *See* Helenihi Decl. ¶ 15, ECF No. 63-1; H-36 Form, ECF No. 67-3 (Ex. C).  The Commission sends the form to the individual's supervision officer, who is then supposed to provide the form to the individual and return it to the Commission.  According to one of the Commission's hearing examiners, Frederick Helenihi, the agency is "very unlikely to hold a hearing without having the H-36" form; rather, its practice is to not hold a hearing "unless" someone has requested a hearing via the H-36 form.  Helenihi Dep. 69:16–22; 70:2–5, ECF No. 78-5 (Ex. D); *see also id.* at 83:18–21 (explaining that the Commission is "not going to actually do the hearing . . . without the actual H-36").

But the Commission admits that parolees' supervising officers sometimes fail to return the completed and signed H-36 form to the Commission, an issue that is "more common than it should be," perhaps in part because of the staff's persistent lack of understanding that these hearings are statutorily mandated.  Helenihi Dep. 65:14–15, 161:13–15, ECF No. 78-5 (Ex. D); Defs.' Objs & Resps. to Pls.' First Set of Reqs. for Admis., ¶ 8, ECF No. 78-4 (Ex. C).  At the time of discovery, the Commission did not have a process for following up with the supervising officers when they failed to return the H-36 Form.  *See* Helenihi Dep. 68:18–20, ECF No. 78-5 (Ex. D).

And still, a variety of other procedural defects have contributed to overdue termination hearings in recent years.  For example, by the Commission's own admission, many parolees have become overdue for their early termination hearings after arrests on erroneous or improper parole

8

violation warrants.  Desrosiers Decl. ¶ 45, ECF No. 88-1.  When an individual has his parole revoked because of a violation, the early-termination clock starts over.  *Id.* ¶ 46.  But when someone's parole violation instead results in a release and reinstatement of parole, the clock for early termination hearing eligibility *does not* restart and continues from the parolee's original date of release.  *Id.*  The supervising agencies, however, have often failed to accurately account for the effect of a release and reinstatement on parolees' early termination hearing eligibility and has instead improperly considered the parolees' eligibility clocks to have restarted at zero after a release and reinstatement.  *Id.* ¶ 47.  Relatedly, at times, the Commission's hearing examiners have failed to flag, after recommending release and reinstatement, that the parolee would soon thereafter be eligible for an early termination hearing.  *Id.*[3]

### 2.  Manual Review Findings

After this lawsuit began, the Commission conducted manual reviews of every parolee's file in 2023, summer 2024, fall 2024, and early 2025, and these reviews uncovered many of the defects described above.  *See* Defs.' Objs. & Resps. to Pls.' First Set of Reqs. for Admis., ¶ 14, ECF No. 78-4 (Ex. C); Desrosiers Decl. ¶¶ 24, 27, ECF No. 88-1.  The reviews were performed manually because the Commission did not maintain a "database or list" of parolees recording the information necessary to determine eligibility for a hearing, meaning that only through a parolee-

---

[3] The Commission bemoans a variety of reasons why the actions of the parolee may result in overdue termination hearings. These include: receiving new pending criminal charges or being released into the custody of another government or agency, "in which case[s] the individual is not on active supervision" and the early-termination clock has either not yet started or has paused.  Desrosiers Decl. ¶¶ 15–18, 46, ECF No. 88-1. Similarly, the Commission points out that, by regulation, when a parolee absconds from supervision, the clock stops running on his sentence as of the date of his absconding, which prevents the expiration of his sentence and thereby tolls parole as well.  *See id.* ¶ 18; 28 C.F.R. § 2.85(d).  However, as discussed in Part III.A.1, unless parole has been revoked, the Commission *must*, by statute, either hold a timely termination hearing or terminate parole by the five-year and subsequent two-year marks.  *See* D.C. Code § 24-404(a-1) ("Five years after a parolee's release on parole, the Commission *shall* terminate legal custody over the parolee *unless* the Commission determines, *after a hearing*, that legal custody of the parolee should not be terminated because there is a likelihood that the parolee will violate any criminal law." (emphases added)).  The Commission makes no attempt to explain how the statute provides a basis for tolling parole.

by-parolee review could the Commission identify which parolees were entitled to a termination hearing—and when.  *See* Nov. 18, 2024 Email Corr., ECF No. 78-17 (Ex. P); Helenihi Dep. 118:18–19, 141:15–22, ECF No. 78-5 (Ex. D); McDaniel Dep. 49:17–22, 50:1–7, ECF No. 78-6 (Ex. E).  When asked in his deposition whether the Commission tracked parolees whose supervision had been continued after a five-year termination hearing—making them due for another hearing no more than two years later—Helenihi, the hearing examiner, testified that he "d[id]n't believe" that the Commission's record-keeping system "would be capable of doing that" as it "currently exists."  Helenihi Dep. 171:18–20, ECF No. 78-5 (Ex. D).

The manual review process began by obtaining a list of all D.C. Code parolees under CSOSA's and USPO's supervision.  Desrosiers Decl. ¶ 25, ECF No. 88-1.  Bernard Desrosiers, the Commission's acting chief of staff, declares that for the 2023 review, he reviewed each individual's parole files to determine when a parolee's next hearing was due and then took steps to either terminate supervision without a hearing or to schedule a hearing.  *Id.*  According to Desrosiers, this "review also allowed the Commission to begin internally tracking these parolees' next hearing dates."  *Id.*  The 2024 reviews were performed through similar means by Commission staff members.  *Id.* ¶ 26.

The Commission's manual reviews revealed figures about parolees whose termination hearings have been overdue during the pendency of this litigation.  In 2023, the Commission identified 42 parolees as overdue for a five-year or two-year termination hearing, which were on average 24.3 months late.  Defs.' Resps. to Pls.' Second Set of Interrogs. to Defs., ¶¶ 1–2, ECF No. 78-3 (Ex. B); Desrosiers Decl. ¶ 29, ECF No. 88-1.  As for 2024, the Commission identified another 15 parolees then overdue for a five-year or two-year termination hearing.  Defs.' Resps. to Pls.' Second Set of Interrogs. to Defs., ¶ 3, ECF No. 78-3 (Ex. B); Desrosiers Decl. ¶ 30, ECF

No. 88-1.  On January 22, 2025—after discovery had closed[4]—the Commission revealed that of the D.C. Code parolees supervised by USPO (i.e., those residing outside the D.C. area), at least one was then 13 months overdue for a hearing.[5]  Desrosiers Decl. ¶ 33, ECF No. 88-1.

The Commission also disclosed data revealing that terminations and termination hearings were overdue in more than 90% of cases from the period of 2022 to 2024.  *See* Defs.' Resps. to Pls.' First Set of Interrogs. to Defs., ECF No. 78-2 (Ex. A).  During that period, 83 individuals received terminations or termination hearings an average of 24 months past the statutory deadlines, including 16 who were over 36 months late, and one whose hearing was overdue by 108 months. *Id.*

### E.  The Commission's Post-Discovery Reform Efforts

By the Commission's own admission, its reliance on CSOSA and USPO to schedule hearings, along with other aspects of its processes, created a "multitude" of "failure point[s]" within the Commission's process.  Helenihi Dep. 137:19–22; 138:1–2, 18–21, ECF No. 78-5 (Ex. D); Opp'n to Mot. 10–13, ECF No. 88 ("Defs.' Opp'n").  But the Commission asserts that it has now implemented reforms to resolve the past issues uncovered in discovery going forward.  Defs.' Opp'n at 10, 13–18.  Those reforms are detailed not in the Commission's discovery responses or

---

[4] The Commission's review of D.C. Code parolees supervised by the Probation Office occurred in January 2025, following the close of discovery.  Desrosiers Decl. ¶ 3, ECF No. 88-1.  The Commission states that the review of Probation Office supervisees occurred in January 2025 "due in part to the Commission's understanding that USPO was in compliance with the Commission's requirements for timely submission of supervision reports and that there were, therefore, unlikely to be parolees supervised by USPO who were overdue for their early termination hearings." *Id.* ¶ 27.  That, of course, turned out not to be true, *see id.* ¶ 32, and in any case, is little excuse for disclosing material information related to numerosity only after the close of discovery.

[5] While the Commission eventually provided Plaintiffs with a list of 50 parolees who are supervised by USPO, this list did "not include a column for tracking the dates of termination hearings" that had already taken place, meaning that the list did not reveal whether and when a parolee would have required a two-year review after an initial continuance.  Pls.' Mem. at 10 n.5, ECF No. 78-1.

11

in an administrative policy or other official document but, instead, in a declaration by Desrosiers that the Commission attached to its opposition filing.  *See* ECF No. 88-1.

### 1.  Lists for Eligibility Tracking

Recall that the Commission's longstanding practice has been to wait to schedule a parolee's hearing until the supervising agency returned both the F-3 report and the H-36 form, even though CSOSA and USPO have routinely failed to provide these documents in a timely fashion—if at all. Desrosiers Decl. ¶¶ 43–44, ECF No. 88-1.  Now, the Commission says, it has taken primary responsibility for tracking early termination hearing eligibility by curating its own lists of all current parolees on active supervision—one for CSOSA-supervised parolees and one for U.S. Probation Office-supervised parolees.  *Id.* ¶ 52.

The Commission asserts that its lists include names and other identifying information for each parolee on active supervision; whether CSOSA or USPO is supervising each parolee; and the last release date for each parolee.  *Id.* ¶ 53.  The agency further represents that it now proactively requests from the supervising agency at least every six months an updated report on all individuals the agency is supervising under the Commission's jurisdiction.  *Id.* ¶¶ 54–55.  According to the Commission, these reports are a means of double-checking its own lists without blindly relying on the supervising agencies' F-3 reports as the sole source of information regarding early termination hearing eligibility.  *Id.* ¶ 55.

Plaintiffs do not agree that the Commission now has a comprehensive list of everyone on parole, pointing out that the Commission's list of 171 CSOSA-supervised parolees does not include all 283 individuals that CSOSA reported were on supervision as of January 15, 2025. Reply at 6, ECF No. 92 (citing Desrosiers Decl. ¶¶ 39–40, ECF No. 88-1).  While the Commission attributes this discrepancy to the fact that their list includes only "active" parolees, Plaintiffs find

12

this explanation to be problematic since those who are on inactive supervision could include individuals who have *earned* that status through success on parole and can become overdue for a termination hearing at any point.  Reply at 6, ECF No. 92; *see also* Desrosiers Decl. ¶ 30, ECF No. 88-1 (indicating that, in 2024, three people who were not on the Commission's active supervision list became overdue).

The Commission attempts to clarify that by "active" status, it means to exclude those individuals for whom it has issued warrants (either because the parolees have absconded or because they have been arrested for a new offense).  Desrosiers Supp. Decl. ¶ 26, ECF No. 97-1.  According to the Commission, the practice of putting parolees on "inactive" status for good behavior has been discontinued and no individual remains in this category of parolees.  *Id.* ¶¶ 27–34.  However, the Commission does not go so far as to say that the 112 parolees who are on CSOSA's list—but not the Commission's—have *all* either absconded or committed new offenses.  What's more, Plaintiffs cast serious doubt on the notion that nearly 40% of all CSOSA-supervised parolees have done so given the recidivism rates that CSOSA itself has reported.  *See* CSOSA Congressional Budget Justification for Fiscal Year 2025, March 11, 2024, at 31, ECF No. 78-18 (Ex. Q) (showing lower rates of rearrest).

### 2.  Manual Reviews

As for instituting systems to make use of these lists, the Commission has represented that it would, as of summer 2025, "complete a yearly manual review of these lists to ensure accuracy and catch any potential anomalies or clerical errors."  Desrosiers Decl. ¶ 57, ECF No. 88-1. However, Plaintiffs point out that while Desrosiers asserts that these yearly manual reviews are now a permanent fixture of the Commission's system for calendaring termination hearings, Helenihi previously testified in his deposition that the reviews were "special projects" conducted

only in response to this litigation and that none were scheduled for the future. Reply at 3, ECF No. 92; Helenihi Dep. 14:16–17, 134:6–17, 139:5–11, 174:4–5, ECF No. 78-5 (Ex. D).

The Commission similarly states that it has instituted a monthly review of all release-and-reinstatement decisions for D.C. Code parolees to ensure that no early termination deadline implications were inadvertently missed. Desrosiers Decl. ¶ 64, ECF No. 88-1. These monthly reviews are meant to ensure that any individuals who were on inactive parole status (i.e., a warrant was out for their arrest) and who are then apprehended on that warrant can be flagged and added to the Commission's lists of active parolees. *Id*. ¶ 65. Desrosiers declares that if an individual is released and reinstated after being on inactive status, this review is intended to catch that change, and the individual is added to the list of active parolees. *Id*. But Plaintiffs again argue that despite Desrosiers's assurances, the Commission's Case Services Administrator has testified that the Commission does not conduct monthly reviews. Reply at 4; McDaniel Dep. 61:17–19; 62:12–20, ECF No. 78-6 (Ex. E).

### 3. Automatic Calendaring

Next, the Commission states that rather than waiting for CSOSA to submit the F-3 reports and H-36 forms to trigger the calendaring process for termination hearings, as of January 2025, the Commission now automatically calendars early termination hearings for D.C.-area D.C. Code parolees as soon as the parolee is six months away from his or her early termination hearing eligibility date. Desrosiers Decl. ¶ 58, ECF No. 88-1. While the Commission still receives F-3 reports and sends out H-36 forms, Desrosiers declares that the calendaring of these hearings is not contingent on receipt of these documents. *Id.*

Here again, however, Plaintiffs offer a different version of the facts. They assert that months after the purported change in practice, the Commission was still requiring that the H-36

14

form be filled out and submitted before scheduling a hearing.  Reply at 4.  Specifically, Plaintiffs represent that parolee William Fox was eligible for an early termination hearing in February 2025, but the Commission would not schedule his hearing until his H-36 form had been returned.  *Id.*  It turns out that the Commission did initially schedule Fox's hearing for February 27, 2025—*without* having received Fox's H-36 form—but this hearing was canceled after a warrant was issued for his arrest due to a technical parole violation; the Commission subsequently required the return of Fox's H-36 form before scheduling the termination hearing for the same date as his upcoming revocation hearing.  Desrosiers Supp. Decl. ¶¶ 10–11, 19, ECF No. 97-1; *see* Email from Lisa Jones, U.S. Parole Commission Hearing Coordinator Specialist, to Natalie Epps, attorney for William Fox (Mar. 19, 2025), ECF No. 93-1 (Ex. A) ("Attached is parole form H-36 that Mr. Fox will need to complete if he desires an early termination hearing.").[6]

As for non-D.C.-area D.C. Code parolees, the Commission asserts that 90 days prior to the hearing eligibility date for these individuals, it coordinates with USPO to schedule an early termination hearing for that parolee via video no later than the month that their hearing is due. Desrosiers Decl. ¶ 59, ECF No. 88-1.  As with the scheduling process for D.C.-area parolees, the

---

[6] After scheduling Fox's termination hearing for February 27, 2025, the Commission apparently reached out to Fox's supervision officer several times for updates on the H-36 form but was eventually informed that he had not reported to the supervision office since November 13, 2024, and that his supervising officer planned to request that a warrant be issued.  Desrosiers Supp. Decl. ¶ 12, ECF No. 71-1.  On February 12, 2025, CSOSA submitted an Alleged Violation Report to the Commission, alleging failure to report on several dates beginning in August 2024, failure to submit to drug testing on several dates beginning in October 2024, and failure to cooperate in seeking and accepting treatment for drug dependency and abuse.  *Id.* ¶ 13.  On February 13, 2025, the Commission issued a warrant, which had the effect of canceling Fox's scheduled early termination hearing.  *Id.* ¶ 14.  On February 20, 2025, the Commission executed the warrant, and on February 27, 2025, following a probable cause hearing, the Commission denied release and held Fox in custody for a revocation hearing, scheduled for April 7, 2025.  *Id.* ¶¶ 16–18.  On March 19, 2025, the Commission reached out to Fox's attorney from PDS regarding Fox's eligibility for an early termination hearing, pending the outcome of his scheduled revocation proceedings.  *Id.* ¶ 19.  In this email, the Commission represented that Fox would need to complete the H-36 form to proceed with an early termination hearing.  *See* Email from Lisa Jones, ECF No. 93-1 (Ex. A).

Commission does not wait to receive the F-3 reports and H-36 forms before calendaring these video termination hearings. *Id.*

In addition to these improvements, as of the summer of 2024, the Commission has designated one of its employees as an early termination hearing specialist to oversee scheduling early termination hearings. *Id.* ¶ 60. This specialist is responsible for calendaring the hearings on eligible parolees' dockets, receiving F-3 reports and H-36 forms from supervising agencies, and tracking the lists of people who will become due for a hearing months in advance. *Id.*

### 4. Issuing Guidance and Training

Since January 2023, when the Commission began conducting manual reviews, the Commission has incorporated guidance into its regularly scheduled staff trainings about termination hearings, including reminding them of the importance of coordinating with the early termination hearing specialist on any parole case so that hearings are timely scheduled. *Id.* ¶ 62–63. Similarly, as of mid-2024, the Commission began issuing guidance reminding supervising agencies, among other things, that "release and reinstate" decisions do not restart the clock for calculating eligibility for early termination hearings. *Id.* ¶ 61. The Commission also now holds periodic training sessions with CSOSA and provides guidance to USPO. *Id.*

\* \* \*

Because of these reforms, the Commission asserts that the number of parolees who were overdue for a hearing had fallen to six parolees at the time of their opposition. Defs.' Opp'n at 10, ECF No. 88. In the Commission's view, however, only five of these parolees come within the newly defined class (i.e., are overdue for and *owed* a hearing at this time) because one of the parolees who is overdue for an early termination hearing will not have one scheduled due to

16

pending criminal charges.  Desrosiers Decl. ¶ 72, ECF No. 88-1.[7]  At the time of the Commission's opposition, all five of the entitled parolees had been scheduled for an early termination hearing to occur between March 2025 and May 2025.  *Id.*

### F.  Current Procedural Posture

On January 23, 2025, Plaintiffs moved again to certify the class Rule 23(a) and (b)(2) and appoint class counsel and at the same time moved for summary judgment.  Mot., ECF No. 78; Mot. Summ. J., ECF No. 79.  On January 30, 2025, the Commission moved to stay further briefing on Plaintiffs' motion for summary judgment pending the outcome of Plaintiffs' motion for class certification.  Mot. Stay, ECF No. 80.  The Court granted the Commission's stay.  Order of Mar. 10, 2025, ECF No. 85.

In opposing Plaintiff's class-certification motion, the Commission moved to dismiss since the Court had previously acknowledged that "[i]f the class is not certifiable after this discovery is complete, then the 'inherently transitory' exception will be inapplicable," and the case would need to be dismissed as moot because the termination hearings of all the named plaintiffs have now occurred.  *Lewis*, 743 F. Supp. 3d at 196 n.6.

Both motions have been ripe since April 28, 2025.  Defs.' Opp'n, ECF No. 88; Pls.' Combined Reply and Opp'n to Mot. Dismiss ("Pls.' Reply"), ECF No. 92; Defs.' Reply to Mot. to Dismiss ("Defs.' Reply"), ECF No. 96.  Shortly thereafter, however, the Commission moved for leave to file a sur-reply to the motion for class certification, attaching the brief to its motion, ECF No. 97, and Plaintiffs filed an opposition, ECF No. 98.

---

[7] As discussed *infra*, whether this parolee is owed a timely termination hearing turns on whether the regulation that prohibits termination before a final disposition of pending criminal charges is consistent with the statutory requirement that parole can only be extended past the five-year mark if the Commission holds a hearing and makes a specific finding.  *See* D.C. Code § 24-404(a-1)(3).

## II.    LEGAL STANDARDS

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700–701 (1979)).  The Federal Rules of Civil Procedure set forth the requirements for class certification in Rule 23.  As a preliminary matter, the movant must show that (1) "the class is so numerous that joinder of all members is impracticable"; (2) "there are questions of law or fact common to the class"; (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and (4) "the representative parties will fairly and adequately protect the interests of the class."  *See* Fed. R. Civ. P. 23(a).  As relevant here, Rule 23(b)(2) allows certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

The burden of demonstrating each requirement falls on the party seeking certification, *see Wal-Mart*, 564 U.S. at 350, and compliance with the rule must be shown by a preponderance of the evidence, *see Lewis*, 743 F. Supp. 3d at 194 & n.2.  Thus, because the movant must prove that each requirement is met "in fact," *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (emphasis omitted), class certification entails a "rigorous analysis" that "demands more of a plaintiff than is required to survive a motion to dismiss" and may "entail some overlap with the merits," *Lewis*, 743 F. Supp. 3d at 194 (quotation omitted).

## III.    DISCUSSION

The parties dispute the commonality and numerosity requirements for class certification, which the Court will address in that order.  But first, the Court turns to whether it should consider the Commission's sur-reply.

18

### A. Sur-Reply

"The decision to grant or deny leave to file a sur-reply is committed to the sound discretion of the Court." *Clendenny v. the Architect of the Capitol*, 236 F. Supp. 3d 11, 17 n.2 (D.D.C. 2017) (cleaned up) (quoting *Akers v. Beal Bank*, 760 F. Supp. 2d 1, 3 (D.D.C. 2011)). While sur-replies "are generally disfavored," *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 247 F. Supp. 3d 76, 93 (D.D.C. 2017), they may be appropriate when "the movant raises arguments for the first time in [its] reply to the non-movant's opposition," *Imapizza, LLC v. At Pizza Ltd.*, No. 17-cv-2327, 2018 WL 6619852, at *1 (D.D.C. July 26, 2018) (quoting *Ying Qing Lu v. Lezell*, 45 F. Supp. 3d 86, 91 (D.D.C. 2014)). But they are generally not permitted when the movant's "reply does not raise any new matters" but rather "merely respond[s] to . . . arguments contained in [the] opposition." *Lightfoot v. District of Columbia*, No. 04-cv-1280, 2006 WL 54430, at *1 n.2 (D.D.C. Jan. 10, 2006). When exercising its discretion to grant or deny leave to file, a court should also consider whether the nonmovant's proposed sur-reply "would be helpful to the resolution of the pending motion[] and whether the movant would be unduly prejudiced were leave to be granted." *Banner Health v. Sebelius*, 905 F. Supp. 2d 174, 187 (D.D.C. 2012).

The Commission contends that Plaintiffs raised new issues for the first time in their reply, including the assertion that the voluntary cessation doctrine precludes the Commission's numerosity argument, and evidence suggesting that the Commission failed to timely calendar a termination hearing for William Fox.[8] In response, Plaintiffs assert that their brief merely

---

[8] The Commission also argues that Plaintiffs' combined class-certification reply and motion-to-dismiss opposition exceeded the page limit under the local rules, which state that a memorandum "in opposition to a motion shall not exceed 45 pages and a reply memorandum shall not exceed 25 pages, without prior approval of the Court." D.C. LCvR 7(e); Defs.' Sur-Reply at 3, ECF No. 97-1. Because all but one page of Plaintiffs' 39-page brief is dedicated to class certification, not the motion to dismiss, *see* Pls.' Reply, ECF No. 92, the Commission asserts that Plaintiffs' brief exceeds the required page limit. But the Court declines the invitation to parse Plaintiffs' brief in this way since the motion to dismiss turns entirely on whether the class may be certified, meaning that the two issues are one and the same.

addresses the arguments made by the Commission's opposition to class certification.  As Plaintiffs

point out, the Commission spent much of the history of this case opposing class certification on

the grounds that its failure to timely schedule termination hearings did not extend past the named

Plaintiffs in this case; yet in its opposition to class certification, the Commission asserts that it has

now "taken a hard look" at its "widespread delays" and resolved its failures going forward.  *See*

Defs.' Opp'n at 23, ECF No. 88.[9]  Of course, Plaintiffs are entitled an opportunity to respond to

the purported reforms that the Commission has implemented and doing so does not introduce new

issues into this litigation.

However, the Court nevertheless finds that the Commission's sur-reply is helpful to the

resolution of the pending motions.  At this juncture, class certification largely turns on the efficacy

of the purported reforms since the existence of future class members depends on whether the

Commission's current system for scheduling termination hearings remains rife with failure points.

The sur-reply, and Plaintiffs' opposition to it, provides some clarity on this admittedly murky issue,

and the Court will therefore consider it.

### B. Commonality

Rule 23(a)(2) of the Federal Rules of Civil Procedure requires the existence of "questions

of law or fact common to the class."  "Commonality requires the plaintiff to demonstrate that the

class members have suffered the same injury."  *Wal-Mart Stores*, 564 U.S. at 349–50 (internal

---

[9] It remains fresh in judicial memory that prior to discovery, the Commission steadfastly denied that the failure to provide timely termination hearings was systemic (or even that the problem extended beyond the four named plaintiffs).  In its June 2024 reply supporting Rule 12(b)(6) dismissal, the Commission disclaimed whether there was "any evidence that a class even exists, or [that] any other plaintiffs remain."  ECF No. 64 at 4.  During discovery, the staff person in charge of scheduling termination hearings refused to acknowledge that the belatedness of hearings affected more than just the four named plaintiffs.  McDaniel Dep. 78:12– 17, ECF No. 78-5 (Ex. D).  All the while— as the Desrosier Declaration, deposition testimony by Commission employees, and the Commission's interrogatory responses have now revealed—the Commission performed *more than 80* overdue termination hearings.  *See supra* Pt. I.D.2.

quotation marks omitted). This requirement is met if "a single aspect or feature of the claim is common to all proposed class members," *Bynum v. District of Columbia*, 214 F.R.D. 27, 33 (D.D.C. 2003), and "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke," *Wal-Mart Stores*, 564 U.S. at 350. Commonality is typically satisfied when there exists "a uniform policy or practice that affects all class members." *DL v. District of Columbia*, 713 F.3d 120, 128 (D.C. Cir. 2013).

This Court previously found that Plaintiffs' prior class definition was overbroad because it included class members who have had their parole revoked or those who have been provided belated hearings. *Lewis*, 743 F. Supp. 3d at 203–04. For those putative class members, the question of whether the Commission has unlawfully withheld its statutorily guaranteed termination hearings was not common to the class members who are or will be owed termination hearings. *Id.* The new class consists of people on parole for D.C. Code offenses who are overdue and owed, or will be overdue and owed, either termination of parole or a termination hearing as required by law. Pls.' Mem. at 25, ECF No. 78-1.

The Commission's only argument against commonality is that Plaintiffs' proposed class definition "would include those who are overdue and owed an early termination hearing but who are not entitled to one due to new pending criminal charges." Defs.' Opp'n at 32, ECF No. 88. In the Commission's view, although a parolee "may have been on parole for five or two years, the existence of a pending criminal charge would not entitle the parolee to either early termination or an early termination hearing under" the Commission's regulations. *Id.* Plaintiffs, on the other hand, argue that if parolees with pending criminal charges are "owed" termination hearings by statute, and the Commission seems to concede that they are, then the Commission's regulations cannot render these parolees "not entitled" to such hearings. Pls.' Reply at 37–38, ECF No. 93.

This dispute requires the Court to decide a question of statutory interpretation that affects the scope (and the size) of the newly defined class: Under § 24-404(a-1), does a parolee's accrual of pending criminal charges justify continuing parole without a hearing past the five-year or two-year mark?  By regulation, the Commission "shall not terminate supervision of a parolee until it determines the disposition of a pending criminal charge." 28 C.F.R. § 2.95(e)(2).  This means that, on occasion, a parolee who accrues a pending criminal charge before becoming due for a termination hearing may have that hearing delayed past the five-year or two-year mark until a revocation hearing is held first.

Recall that, by statute, "[f]ive years after a parolee's release on parole, the Commission *shall* terminate legal custody over the parolee *unless* the Commission determines, *after a hearing*, that legal custody of the parolee should not be terminated because there is a likelihood that the parolee will violate any criminal law." D.C. Code § 24-404(a-1)(3) (emphases added).  And "[i]f the Commission does not terminate legal custody" after this hearing, it "*[s]hall* conduct a hearing every 2 years to determine whether to terminate legal custody of the parolee." *Id.* § 24-404(a-1)(4) (emphasis added).  While the accrual of pending criminal charges could quite reasonably support a likelihood that the parolee will violate a criminal law, § 24-404(a-1) unambiguously states that parole "shall" terminate at the five-year mark unless the Commission holds a hearing to make the requisite finding of likelihood, and similarly the Commission "shall" hold a hearing every two years thereafter to continue parole.

In sum, reading § 24-404(a-1)'s mandatory and conditional language ("shall terminate . . . unless . . . a hearing") in light of the fact that the statute provides no textual exception for pending charges or pending revocation hearings, the plain text leads the Court to conclude that the five-year and two-year deadlines remain mandatory even when new charges and revocation

22

proceedings remain pending.   Unless parole has been revoked, § 24-404(a-1) requires the Commission to hold a timely termination hearing or terminate parole by the deadline, irrespective of the flexibility its own regulations might allow.

That is not to say that a parole violation cannot subsequently result in a return to prison and additional term of parole even if the original term of parole terminates before the Commission holds a revocation hearing.   Rather, so long as a warrant issues for the parole violation before the expiration of the parole term, the Commission's jurisdiction continues.   *See* D.C. Code § 24-205 (stating that the Parole Board may issue a warrant "at any time within the term or terms of the prisoner's sentence" to retake a parole violation); *id.* § 24-206(a) (stating that, upon retaking and a hearing, the Board "may then, or at any time in its discretion" require the parolee to "serve the remainder of the sentence originally imposed," subject to re-parole discretion); *cf. Rico v. United States*, No. 24-1056, slip op. at 11 (U.S. Mar. 25, 2026) (holding that while the Sentencing Reform Act does not authorize extending a defendant's term of supervised release when the defendant absconds, the Act does allow courts to impose additional imprisonment and supervised release for violation).   But this question is not before the Court.   For present purposes, what matters is that § 24-404(a-1)'s textual requirement that termination hearings must be held before the Commission may extend parole applies equally to all class members.   Commonality is therefore met.

### C.  Numerosity

Federal Rule of Civil Procedure 23(a)(1) requires movants to show, by a preponderance of the evidence, that "joinder of all members is impracticable."   Thus, the numerosity requirement would more aptly be called "impracticability," since whether the size of a proposed class merits certification is not tethered to any numerical bright line.   Indeed, as this Court has explained, "numerosity is about much more than just the total number of class members." *N.S. v. Hughes*,

23

335 F.R.D. 337, 352 (D.D.C. 2020). A "reasonable estimate," rather than "the exact number of potential class members," can often suffice. *Id.* (alteration omitted) (quoting *Lightfoot v. District of Columbia*, 246 F.R.D. 326, 335 (D.D.C. 2007)). The dispositive question, far from a mere counting exercise, is whether "the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *D.L. v. District of Columbia*, 302 F.R.D. 1, 11 (D.D.C. 2013), *aff'd*, 860 F.3d 713 (D.C. Cir. 2017); *accord Coleman ex rel. Bunn v. District of Columbia*, 306 F.R.D. 68, 76 (D.D.C. 2015) (explaining that Rule 23(a)(1)'s "core requirement is that joinder be impracticable and numerosity merely provides an obvious situation in which" that may be so (quoting Newberg on Class Actions § 3:11 (5th ed. 2014) (internal quotation marks omitted))).

Inherently fluid classes are those where "strict numerical threshold[s]" and "sheer numerical terms" take a backseat to Rule 23's textual focus on the practicability of joinder. *N.S.*, 335 F.R.D. at 352–53 (D.D.C. 2020). In cases where membership in the claimant population may be in flux at any given moment, it may be "difficult to ascertain how many class members there will be, and the question simply becomes whether the existence of unknown and unnamed future class members would make joinder difficult." *Id.* at 352 (citing *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019)).

In all cases, numerosity "requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). "Mere conjecture," of course, "is insufficient to establish numerosity." *Pigford v. Glickman*, 182 F.R.D. 341, 347 (D.D.C. 1998); *see also Lewis*, 743 F. Supp. 3d at 203 (denying Plaintiffs' earlier certification motion for failure to "proffer[] any non-conjectural evidence that a significant number of these current or future parolees are or will be denied the hearings they are owed"). "To hold

24

otherwise would be to render the numerosity requirement toothless and belittle Rule 23's demand for a 'rigorous analysis.'" *Lewis*, 743 F. Supp. 3d at 203 (quoting *Wal-Mart*, 564 U.S. at 351).

Plaintiffs contend that the class is numerous for largely the same reasons they asserted in their initial motion for class certification: namely, that they have identified multiple parolees who are currently "overdue for parole termination hearings," and that the class is fluid, such that "the existence of future class members makes joinder impracticable." *Id.* Based both on numerical and non-numerical information unearthed in discovery, the Court agrees that joinder of all class members would be impracticable and numerosity is therefore met.

### 1. Existing Class Members

Plaintiffs contend that the number of parolees currently overdue for termination hearings likely satisfies the numerosity requirement given the fluidity of the class. Despite the transitory nature of the class, there were eight parolees overdue for hearings as of the filing of their motion, which satisfies the numerosity requirement in the case of "fluid" classes subject to "systemic" rights violations. Pls.' Mem. at 19, ECF No. 78-1 (quoting *Clarkson v. Coughlin*, 145 F.R.D. 339, 348 (S.D.N.Y. 1993)). That figure is based on data the Commission produced during discovery, but Plaintiffs say that "[t]he actual number of individuals overdue at this moment is likely larger" because "[t]he Commission does not possess a list of everyone on parole, or even have a firm grasp of how many people are on parole." *Id.* at 20. In response, however, the Commission asserts that at the time of its opposition in March 2025, the true number of parolees eligible and overdue for a hearing was only five, Desrosiers Decl. ¶ 72, ECF No. 88-1, and the Commission had scheduled hearings for all five of those parolees to take place by May 2025, meaning they would "no longer be part of the class after June 2025." Defs.' Opp'n at 23, ECF No. 88.

Of course, a parolee with a *scheduled* hearing is still *overdue* for that hearing until such hearing occurs, and the Commission has yet to substantiate that such hearings took place as asserted. In other words, the Commission concedes that at the time of its opposition, there were at least five class members. Why the Commission would not expedite the completion of those hearings before the latest round of class certification practice is anybody's guess, but their failure gives little confidence in the reliability of its processes.

However, although the *known* universe of existing class members is between five and eight, Plaintiffs contend that the actual number is likely higher for multiple reasons. First, at the time the motion was filed in January 2025, the Commission had not yet compiled a comprehensive list of potential class members. Pls.' Reply at 13, ECF No. 93 (noting that the Commission anticipated completing its review of files "by the middle of April 2025" (quoting Defs.' Opp'n at 30, ECF No. 88)). Second, the Commission's count of class members is based on data from an agency, CSOSA, that "routinely fail[s]" to provide necessary information. *Id.* (quoting Defs.' Opp'n at 11, ECF No. 88). Third, the Commission and CSOSA produce widely varying numbers of the total number of parolees under the Commission's supervision. According to the Commission, 171 individuals are under its supervision, but CSOSA reported that there were 283 such individuals as of January 2025. Plaintiffs cite the 112-parolee disparity as undermining confidence that the Commission has accounted for the full universe of parolees under its remit, given that the Commission stated in discovery that it is "not able to explain" the difference between its own count of parolees and CSOSA's. *Id.* at 6 (quoting Defs.' Opp'n at 30, ECF No. 88).

The Court agrees that the Commission's own declaration, to say nothing of the discovery record, casts significant doubt on whether the Court can trust the Commission's math. For example, the Commission implicitly admits that at the time of its opposition, it did not actually

26

know the full universe of parolees on active supervision versus inactive supervision.  Although the Commission states that it was aware of 171 individuals supervised by CSOSA on active supervision as of December 4, 2024, it acknowledges that it does not know whether these figures remain accurate.  Defs.' Opp'n at 30, ECF No. 88.  The Commission declares that as of January 2025, "CSOSA reported having 283 individuals on supervision, only some of which are on *active* supervision."  Desrosiers Decl. ¶ 40, ECF No. 88-1.  Critically, the Commission failed to tabulate *how many* were on active supervision at the time of its opposition, a process it said would only be complete "by the middle of April 2025" and a point on which it has yet to update the Court despite having submitted its sur-reply on April 28, 2025.  *Id.*; Defs.' Sur-Reply, ECF No. 97-1

Without an unambiguous explanation of why CSOSA's list of supervised parolees includes 283 people while the Commission's list contains only 171, this Court has little confidence in the Commission's accounting of parolees—especially since the Court finds it unlikely that nearly 40% of all CSOSA-supervised parolees have either absconded or committed new offenses.  *See* CSOSA Congressional Budget Justification Fiscal Year 2025, March 11, 2024, at 31, ECF No. 78-18 (reporting much lower percentages of parolees who face arrests for new criminal charges).  And since the Commission's proffered count of currently overdue parolees is derived from a list that, even at the time of its opposition, was not yet complete, the Court cannot take the Commission's count at face value.

And in any case, this practice of distinguishing between parolees who are actively or inactively supervised is problematic for the purposes of scheduling termination hearings because, as discussed above, under the plain text of § 24-404(a-1), unless parole has been revoked, the Commission *must*, by statute, either hold a timely termination hearing or terminate parole by the five-year and subsequent two-year marks—irrespective of whether the parolee has absconded or

27

faces pending charges.  As mentioned, while the Court sees no reason why a violation of parole would not subsequently result in prison time or a new term of parole (assuming the warrant issues before the original term of parole terminates), the Court finds no basis in the statutory text for extending parole absent a hearing—the statute simply does not contemplate tolling.  And because the Commission admits that it does not track parolees who are not "actively" supervised, these parolees slip the cracks of the Commission's new system for scheduling hearings unless and until their parole has been reinstated.

The Court has no way of knowing how many "inactively" supervised paroles may be currently overdue for a termination hearing.  But the issue of numerosity ultimately does not turn exclusively on the number of *current* class members.  After all, the Commission cannot disregard the "unambiguous statutory and regulatory deadline" fixed by law, even if it only learns that the deadline of a parolee's hearing has passed as a result of this litigation.  *Lewis*, 743 F. Supp. 3d at 197.  Indeed, throughout this litigation, the Commission has swiftly set termination hearings upon learning one is overdue.  This was true of the four named plaintiffs, who "once named[,] . . . had their parole terminated within about six months," and two of whom "had their parole terminated in fewer than ten days."  *Id.* at 194.  It was the case with the 83 parolees revealed to have received an overdue termination hearing through discovery.  Defs.' Responses to Pls.' First Set of Interrogs. to Defs., ECF No. 78-2 (Ex. A).  And the Commission says it is so for the handful of parolees (whether five, eight, or some other figure) who were putative class members at the time plaintiffs renewed their motion for class certification.  This inescapable feature of the litigation—that the Commission, upon learning that a class member exists, has a legal duty to set a hearing, thereby negating class membership—is precisely what makes the putative class "fluid."  As such, the Court now turns to the matter of *future* class members.

### 2.    Future Class Members

Ordinarily, a class presently consisting of about five members would indeed present a numerosity challenge. *Coleman*, 306 F.R.D. at 76 ("[A] class that encompasses fewer than 20 members will likely not be certified absent other indications of impracticability of joinder." (quoting Newberg on Class Actions § 3:11 (5th ed. 2014))). But while Plaintiffs "cannot establish the exact number of class members," they have "shown that there are likely more than just a handful of class members." *N.S.*, 335 F.R.D. at 352. And far from defeating class certification, the fluidity of the class is a telling indicator of impracticality. *E.g.*, *J.D.*, 925 F.3d at 1323 (describing the "fluidity" of a class as a "non-numerical consideration[] that might make joinder impracticable").

The Commission concedes that the pre-suit system for scheduling termination hearings suffered from deficiencies that resulted in preventable delays. Defs.' Opp'n at 10–13, ECF No. 88. Indeed, the Commission would be hard pressed to deny this, given the evidence that surfaced in discovery—such as the fact that from 2022 to 2024 terminations and termination hearings were overdue in more than 90% of cases. Defs.' First Supp. Objs. & Resps. to Pls.' First Set of Interrogs. & Req. for Produc., ECF No. 78-2 (Ex. A). Still, they insist that this historical data is irrelevant to the Court's inquiry and that the Commission's reform efforts have solved the problems that previously plagued its process for scheduling termination hearings. Defs.' Opp'n at 26–30, ECF No. 88. The Court takes these arguments in turn.

#### i.    Historical Data

The crux of the parties' dispute on numerosity is whether the number of *future* class members, in light of the Commission's putative reforms, supports class certification. As mentioned, more than 90% of the 83 hearings and terminations held during the pendency of this

29

case were held late.  Defs.' First Supp. Objs. & Resps. to Pls.' First Set of Interrogs. & Req. for Produc., ECF No. 78-2 (Ex. A).  And for these 83 individuals who received late early termination hearings between 2022 and 2024, hearings occurred, on average, nearly two years late.  *Id*. Nineteen of those were at least three years late, and one parolee's hearing was overdue by nine years.  *Id.*  But every one of them eventually obtained a hearing or otherwise had their parole terminated on the record.

Nonetheless, these historic numbers remain essential to the numerosity inquiry.  It is true that where the aforementioned hearings resulted in terminations, the former parolees are plainly not members of the class anymore, and the Commission seizes on this point.  Defs.' Opp'n at 26, ECF No. 88.[10]  But the entire batch of overdue parolees, and their incidence as a percentage of the total D.C. code parolee population, remains relevant—not because they can be counted as class members, but because they "inform [a] prospective determination of whether a sufficiently numerous" or otherwise impracticable "class—made up largely of future claimants—exists." *Hinton v. District of Columbia*, 567 F. Supp. 3d 30, 54 n.13 (D.D.C. 2021).

The Rule 23(a)(1) inquiry for fluid classes places less emphasis on a sheer counting exercise and focuses instead on a careful inquiry into the *impracticability* of joining the "unknown and unnamed future class members." *N.S.*, 335 F.R.D. at 353 (applying the logic of *J.D.* to find "numerosity not because of the specific number of members, but because future class members were unknown and unnamed" and therefore could "[]not be joined" at the filing of the class action complaint).  When a class representative "seeks prospective relief for future class members, whose identities are currently unknown and who are therefore impossible to join," joinder is "inherently

---

[10] Of course, to the extent any of the current class members, or the 83 parolees who received a hearing between 2022 and 2024, had their parole continued after their hearing, they are still potentially future class members.

30

impracticable." *DL v. District of Columbia*, 302 F.R.D. 1, 11 (D.D.C. 2013) (quotation omitted); *see also J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019) ("[C]lasses including future claimants generally meet the numerosity requirement due to the 'impracticality of counting such class members, much less joining them.'" (quoting 1 Rubenstein, Newberg on Class Actions § 3:15)).

The incidence of overdue hearings in the past is strong evidence of what fortune awaits current and future parolees. And used in that manner, this data is the bread and butter of the numerosity inquiry, at least when a Court ventures an estimate of headcount as part of its analysis. For example, in *Bynum v. District of Columbia*, the Court found a proposed class satisfied the numerosity requirement based on data showing that "between May 2002 and January 2023, ninety-seven inmates were detained for 48 hours or more after their scheduled release date." 214 F.R.D. at 33. And this case is not unique in its treatment of fluid classes. *See, e.g.*, *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 531 (D.D.C. 2020) (historical data regarding deportation of unaccompanied minors); *D.L.*, 302 F.R.D. at 11 (relying on data from 2008 to 2010 to calculate numerosity of four subclasses).

Given this precedent, the Court sees no reason not to consider the historical data of overdue termination hearings as evidence of future class members, to the extent there also exists evidence that the problems with the Commission's system have persisted. It is this issue that the Court turns to next.

### ii.    Effect of Reforms

The Commission adamantly denies that class members will continue to exist following its recent modifications to its termination hearing process since the outset of this litigation. Favoring the Desrosiers Declaration's tale of reform over the troubling narrative contained in the discovery record, the Commission asserts its post-discovery reforms mean there is now "no reasonable basis

to conclude that the number of parolees who are or will be overdue will rise to any level to justify certification of a class." Defs.' Opp'n at 23, ECF No. 88. Plaintiffs assert a litany of defects in the Commission's reliance on the Desrosiers Declaration.

First, they discredit the declaration as containing self-serving descriptions of "compliance policies that were created and implemented during this litigation." *D.L.*, 187 F. Supp. 3d at 15 (emphasis omitted). Of course, the Commission owes Plaintiffs and the potential class members a statutory duty to provide timely termination hearings, and upon learning of a newly identified parolee owed such a hearing, the Commission would be derelict not to attempt to improve its system. That being said, the Court has not forgotten that it rejected Plaintiffs first attempt to establish numerosity after finding that their "sole declarant's vague say-so [was] not enough by itself to clear" their burden under Rule 23. *Lewis*, 743 F. Supp. 3d at 203. Now Plaintiffs have returned with ample evidence of a systemic failures and the Commission attempts to rebut that evidence with the say-so of its own sole declarant.

But more importantly, certain revelations cast serious doubt on the Commission's representations that "the overall trajectory of the numbers of parolees that the Commission has identified for an early termination hearing has dropped dramatically since 2022." Defs.' Opp'n at 27, ECF No. 88. Recall that the Commission still cannot assure the Court that it knows every member who might be eligible for a termination hearing, let alone every member overdue for one. Along with its failure to compile a complete list of all parolees, this failure is also due to the Commission's system for scheduling termination hearings that still requires ad hoc, manual reviews of data from a supervising agency that the Commission discredits as "routinely" unreliable. Desrosiers Decl. ¶ 43, ECF No. 88-1. Indeed, even the Commission's own declaration acknowledges that the majority of the overdue parolees identified in the Commission's Summer

32

2024 manual review "did not become overdue for an early termination hearing until *after* [the 2023] review." *Id.* ¶ 30 (emphasis added). In other words, the agency's 2023 manual review failed to account for parolees who would *become* overdue before its next review. So long as the Commission's only proposal is to review files by hand, human errors like these will continue to threaten parolees' statutory right to a prompt termination hearing.[11]

As for the Commission's pre-suit "opt-in" practice of requiring parolees' supervising officers to return the H-36 form before calendaring a hearing, the evidence is mixed as to whether the Commission has followed through on its promise to adopt an "opt-out" practice of scheduling hearings without having first received the H-36 form. In the case of William Fox, the Commission did, to its credit, schedule a termination hearing for February 27, 2025, without having first received Fox's H-36 form. Desrosiers Supp. Decl. ¶¶ 10–12, ECF No. 97-1. Fox nevertheless became overdue for a termination hearing because his hearing was canceled after a warrant issued for his arrest due to a parole violation (putting him on "inactive" supervision status). *Id.* ¶¶ 14–15. When the Commission reached out to Fox's counsel to reschedule his termination hearing for the date of his revocation hearing, the Commission indicated that it would not do so until his H-36 form was returned. Email from Lisa Jones, U.S. Parole Commission Hearing Coordinator Specialist, to Natalie Epps, attorney for William Fox (Mar. 19, 2025), ECF No. 93-1 (Ex. A) ("Attached is parole form H-36 that Mr. Fox will need to complete if he desires an early termination hearing."). In the Court's view, Fox's case illustrates that the Commission is still working out the details of its reform efforts. While the Court does not doubt that the Commission

---

[11] What's more, there is evidence suggesting that these manual reviews were "special projects" conducted only in response to this litigation, raising questions about whether they will be regularly scheduled in the future. Helenihi Dep. 14:16–17, 174:4–5, ECF. No. 78-5 (Ex. D). While the Desrosiers declaration may state otherwise, the Commission does not explain this discrepancy in the record.

has acted with the best of intentions, there is insufficient evidence to suggest the problems that have historically plagued its system for holding termination hearings are now remedied.

### iii.    Voluntary Cessation

The voluntary cessation doctrine provides a helpful lens for describing why the Commission's reform efforts, as described in the Desrosiers declarations, come too little and too late to overcome the wealth of evidence presented by Plaintiffs. "It is well settled that the voluntary cessation of allegedly unlawful conduct does not moot a case in which the legality of that conduct is challenged." *Kifafi v. Hilton Hotels Ret. Plan*, 701 F.3d 718, 724 (D.C. Cir. 2012) (quotation omitted). And while there is no doubt that "[c]orrective action by an agency is one type of . . . development that can moot a previously justiciable issue," *Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*, 680 F.2d 810, 814 (D.C. Cir. 1982), such action typically needs to amount to near-permanent change in the status quo that makes it "impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013). Desrosiers' Declaration recites the Commission's putative reforms in what amounts to little more than a "promise not to violate" Plaintiffs' rights in the future, and that alone "is insufficient." *Kifafi*, 701 F.3d at 724.

For its part, the Commission observes that voluntary cessation formally operates as an exception to Article III mootness, and insists that it has not "argu[ed] mootness as a basis for the Court [to] deny[] class certification." Sur-Reply at 2, ECF No. 97-1. But while the Commission cloaks its arguments in the garb of Rule 23's numerosity requirement, its position sounds in the mootness doctrine. *See Ramirez v. U.S. Immigr. & Customs Enft*, 568 F. Supp. 3d 10, 30–31 (D.D.C. 2021) (observing that "while not explicitly framed as such, Defendants appear to invoke the doctrine of mootness by arguing that they have cured their previous statutory non-compliance,

34

so no irreparable injury remains").  In essence, the Commission says that irrespective of its past conduct, certification now would be improper because the Commission has engaged in an array of reforms that will "ensure that the number of potential class members is not likely to rise anywhere close to a sufficiently numerous level in the future."  Defs.' Opp'n at 26, ECF No. 88.  But as already explained, the Court is not confident that these reforms really do amount to a near-permanent change in the status quo.

Here's the bottom line: at the time of the pending motion, (1) discovery had shown that nearly 90% of termination hearings have been overdue over the last several years, (2) at least five active class members existed; and (3) the Commission had not implemented permanent reforms to prevent future violations.  Faced with years of evidence of statutory violations, as well as evidence of *ongoing* violations, "pointing to the existence of compliance policies that were created and implemented *during this litigation* does not meaningfully contribute to a finding that future violations are unlikely to recur."  *D.L.*, 187 F. Supp. 3d at 15.

Put simply, based on the evidence, the putative class will persist because of the ongoing deficiencies in the Commission's system for holding the statutorily mandated termination hearings.  As such, the Commission's efforts toward post-suit compliance with its statutory obligations are insufficient to defeat class certification.  The Court holds that the existence of current class members, paired with the high likelihood of future class members as evidenced by the past rate of violations, along with the faults in the Commission's reform efforts, makes joinder of all claims impracticable, satisfying Rule 23(a)(1).

## IV.    CONCLUSION

For the reasons given above, the Commission's motion for leave to file a sur-reply will be **GRANTED**, Plaintiffs' motion for class certification will be **GRANTED**, and the Commission's

motion to dismiss will be **DENIED**.  As for Plaintiffs' pending motion for summary judgment, it will be **DENIED** with leave to refile, given the subsequent development of the record.


    **IT IS SO ORDERED.**


Date: _____ March 31, 2026

                                    Royce C. Lamberth
                                    United States District Judge